1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA**
10

11  SARAH M. Q.,                        Case No. SA CV 25-586-E

12              Plaintiff,

13      v.
                                        **MEMORANDUM OPINION**
14
    FRANK BISIGNANO,
15  Commissioner of Social Security,[1]

16              Defendant.

17

18

19                          **PROCEEDINGS**

20

21      Plaintiff filed a complaint on March 25, 2025, seeking review of the

22  Commissioner's denial of disability benefits. The parties consented to proceed

23  before a United States Magistrate Judge on April 4, 2025. Plaintiff filed "Plaintiff's

24  Brief" on August 14, 2025. Defendant filed "Commissioner's Brief, etc." on

25  November 6, 2025. Plaintiff did not file a timely reply.

26  ///

27  _____

28  [1]    Frank Bisignano, Commissioner of Social Security, is hereby substituted as
    Defendant in this matter. See Fed. R. Civ. P. 25(d)(1); 42 U.S.C. § 405(g).

1    **BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

2

3    On April 10, 2018, Plaintiff filed an application for supplemental security

4    income based on physical and mental impairments[2] (Administrative Record

5    ("A.R.") 24, 348-50, 370, 388-96).  At a hearing in June of 2020, Plaintiff testified

6    to subjective symptoms of allegedly disabling severity (A.R. 197-206).  Plaintiff's

7    mother submitted written statements corroborative of Plaintiff's testimony (A.R.

8    400-07).

9

10    In a July 1, 2020 decision, an Administrative Law Judge ("ALJ") found that

11    Plaintiff had the following severe impairments: morbid obesity, anxiety, depression,

12    obsessive-compulsive disorder, fibromyalgia, and breathing problems (A.R. 24-36).

13    However, the ALJ found Plaintiff not disabled since the April 10, 2018 application

14    date (A.R. 36).  The ALJ discounted Plaintiff's testimony as "not entirely consistent

15    with the medical evidence and the other evidence in the record. . . ."  (A.R. 30).

16    The ALJ generally discussed some of the medical record (A.R. 30-34), and then

17    stated:

18

19    As for the claimant's statements about the intensity, persistence, and

20    limiting effects of his or her symptoms, they are inconsistent because

21    despite the claimant's allegations, the claimant's medical records

22    demonstrate that her physical and mental impairments are being

23    managed medically.  The claimant's recent treatment for her mental

24

25    [2]    Plaintiff alleges disability based on depression, post traumatic stress disorder
("PTSD"), anxiety, borderline personality disorder, dissociative identity disorder,

26    migraines, asthma, left leg bursitis, left leg tendonitis, a torn "glutimus" muscle in

27    the left leg, endometriosis, inflammation disorder, chronic kidney stones, pain
syndrome, high blood pressure, high cholesterol, and arthritis in her spine (A.R.

28    370, 434, 1478).

1    impairments demonstrates that although the claimant has continued
2    symptoms of depression and anxiety, her mental status is largely
3    normal. The medical opinion from the claimant's therapist Ms.
4    Hoffman indicates the claimant made great progress with her academic
5    achievements with appropriate accommodations.

6

7    (A.R. 34 (citation omitted)). The ALJ did not then discuss Plaintiff's alleged
8    limitations in detail. The ALJ also did not then mention the written statements
9    submitted by Plaintiff's mother. See A.R. 26-35. The Appeals Council considered
10   additional evidence, but denied review (A.R. 1-6).

11

12   Plaintiff sought review from this Court in Sarah M. Q. v. Kijakazi, Case No.
13   SA CV 21-318-E. On February 4, 2022, the Court remanded the matter for further
14   administrative proceedings, finding, in part, that the ALJ erred in discounting
15   Plaintiff's testimony by relying solely on a generally stated, perceived
16   inconsistency between Plaintiff's testimony and the objective medical evidence.
17   See A.R. 1289-1305 (Order and Judgment citing, inter alia, Burch v. Barnhart, 400
18   F.3d 676, 681 (9th Cir. 2005) (an asserted lack of supporting medical evidence can
19   be a factor in discounting a claimant's subjective complaints, but cannot "form the
20   sole basis")). The Appeals Council subsequently vacated the Commissioner's final
21   decision and remanded the matter for further proceedings consistent with this
22   Court's February, 2022 order (A.R. 1308-09).

23

24   On remand, the same ALJ conducted another administrative hearing, at
25   which Plaintiff and a vocational expert testified (A.R. 1208-27). Plaintiff once
26   again testified to subjective symptoms of allegedly disabling severity (A.R. 1212-
27   22). In a January 31, 2024 decision, the ALJ again found Plaintiff not disabled
28   since the April 10, 2018 application date (A.R. 1176-99). The ALJ found Plaintiff

3

1    had the following severe impairments: morbid obesity, fibromyalgia, asthma,

2    lumbar spine degenerative disc disease, anxiety disorder, depressive disorder, and

3    obsessive-compulsive disorder (A.R. 1179). However, the ALJ also found Plaintiff

4    retained a residual functional capacity ("RFC") to perform a range of light work

5    with: (1) occasional postural activities; (2) no ladders, ropes, scaffolds, unprotected

6    heights, open bodies of water, or dangerous machinery; (3) no concentrated

7    exposure to extremes of temperature, excessive noise, vibration, or pulmonary

8    irritants; (4) work limited to noncomplex tasks in a routine environment;

9    (5) occasional interaction with coworkers and supervisors and no public interaction;

10    and (6) no fast-paced work such as rapid assembly or conveyor belt work. See A.R.

11    1183-97 (finding "generally persuasive" the most recent consultative examiner

12    opinions, and discounting Plaintiff's testimony suggesting greater limitations). The

13    ALJ concluded that Plaintiff was not disabled because there assertedly existed

14    significant numbers of light jobs Plaintiff could perform. See A.R. 1198 (adopting

15    vocational expert testimony at A.R. 1223-26). The Appeals Council denied review

16    (A.R. 1163-68).

17

18                             **STANDARD OF REVIEW**

19

20         Under 42 U.S.C. section 405(g), this Court reviews the Administration's

21    decision to determine if: (1) the Administration's findings are supported by

22    substantial evidence; and (2) the Administration used correct legal standards. See

23    Carmickle v. Comm'r, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499

24    F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Comm'r, 682 F.3d 1157, 1161

25    (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable

26    mind might accept as adequate to support a conclusion." Richardson v. Perales,

27    402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v.

28    Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

1    If the evidence can support either outcome, the court may not

2    substitute its judgment for that of the ALJ. But the Commissioner's

3    decision cannot be affirmed simply by isolating a specific quantum of

4    supporting evidence. Rather, a court must consider the record as a

5    whole, weighing both evidence that supports and evidence that detracts

6    from the [administrative] conclusion.

7

8    Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations

9    omitted).

10

11                                    **DISCUSSION**

12

13        Plaintiff contends that the ALJ again failed to state legally sufficient reasons

14    for discounting Plaintiff's testimony and statements suggesting greater limitations

15    than the ALJ found to exist. The Court disagrees. As discussed below, the

16    Administration's findings in the January 31, 2024 decision are supported by

17    substantial evidence and are free from material[3] legal error.

18

19    **I.    Substantial Evidence Supports the ALJ's Conclusion that Plaintiff Can**

20    **Work.**

21

22        Substantial evidence supports the conclusion that Plaintiff is not disabled. In

23    finding Plaintiff capable of a range of light work performing noncomplex tasks in a

24    routine environment, the ALJ found "generally persuasive" the most recent

25    consultative examiner opinions. See A.R. 1194-95; see also A.R. 2170-75 (Dr.

26    _____

27    [3]    The harmless error rule applies to the review of administrative decisions
regarding disability. See McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011);
28    Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

1    Daniela Drake's July, 2021 internal medicine consultation opining that Plaintiff
2    was capable of a range of light work consistent with the ALJ's RFC assessment);
3    A.R. 2176-84 (Dr. Charlene Krieg's November, 2022 psychological evaluation
4    opining that Plaintiff would be capable of performing simple/repetitive and
5    complex/detailed work tasks, completing a normal workday or workweek, dealing
6    with the usual stress in competitive work, and adjusting to change); see also A.R.
7    2182-84 (Dr. Krieg's Medical Statement of Ability to Do Work-Related Activities
8    (Mental) form indicating no limitations). The ALJ considered the remaining
9    medical opinions in the record and found those opinions not as persuasive as the
10   medical opinions referenced above. See A.R. 1192-97 (discussing the remaining
11   medical opinion evidence).

12

13        The consultative examiner opinions on which the ALJ relied furnish
14   substantial evidence to support the ALJ's RFC assessment. See Orn v. Astrue, 495
15   F.3d 625, 631-32 (9th Cir. 2007) (opinion of examining physician based on
16   independent clinical findings can provide substantial evidence to support
17   administrative conclusion of non-disability). The vocational expert testified that a
18   person with the RFC the ALJ found to exist could perform jobs existing in
19   significant numbers in the national economy. See A.R. 1223-26. The ALJ properly
20   relied on the vocational expert's opinion in finding Plaintiff not disabled. See
21   Barker v. Sec'y of Health and Human Servs., 882 F.2d 1474, 1478-80 (9th Cir.
22   1989); Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

23

24   **II.    The ALJ Did Not Materially Err in Discounting Plaintiff's Subjective**
25         **Complaints.**

26

27        Plaintiff contends that the ALJ impermissibly rejected Plaintiff's testimony
28   suggesting greater limitations than the ALJ found to exist because the ALJ "simply

6

1    states that the objective medical evidence does not support [Plaintiff's] testimony."

2    See Plaintiff's Brief at 5 (citing A.R. 1183-92); id. at 9 (arguing, "Beyond the

3    discussion of the objective medical evidence, it does not appear that the ALJ

4    actually offered any rationale to reject the testimony of [Plaintiff]. The ALJ simply

5    offers a conclusion that the medical evidence does not support the testimony.";

6    citing A.R. 1185-86, 1197).

7

8         Plaintiff mischaracterizes the ALJ's most recent decision. In determining

9    Plaintiff's RFC on remand, the ALJ again discounted Plaintiff's testimony

10    suggesting greater limitations as "not entirely consistent with the medical evidence

11    and the other evidence in the record. . . ." (A.R. 1185). However, unlike the ALJ's

12    prior decision, the ALJ's post-remand decision details at length Plaintiff's

13    allegations and the medical evidence, identifying asserted inconsistencies with

14    enough specificity for this Court to conclude that the ALJ discounted Plaintiff's

15    testimony and statements on permissible grounds.

16

17        **A.**    **Summary of the Relevant Medical Record**

18

19         The following summary of the longitudinal medical record provides context

20    for Plaintiff's allegations and the ALJ's stated reasoning.

21

22         The record includes notes from a number of emergency room visits for

23    physical conditions prior to the alleged disability period (i.e., before April of 2018).

24    See A.R. 473-804, 1795-2110 (treatment for conditions including kidney stones,

25    fibromyalgia, anxiety-related chest wall pain, chronic back pain, endometriosis, and

26    headaches).

27    ///

28    ///

1        The record for the alleged disability period reflects treatment for some of the
2    mental and physical conditions that Plaintiff claimed limited her ability to work.
3    See Footnote 2, supra (listing conditions). There are neurology treatment notes
4    from September of 2017 through May of 2018, for headaches, depression, anxiety,
5    and poor sleep (A.R. 806-15). Plaintiff had been prescribed Elavil, Percocet, and
6    Lasix (A.R. 807, 809). In April of 2018, she reported she was having headaches
7    three times a week (A.R. 806; compare A.R. 381-82 (Plaintiff's April, 2018
8    headache questionnaire reported she had headaches lasting several days with
9    vomiting, brain fog, and memory issues)). In May of 2018, she reported daily
10   headaches (A.R. 815). Her neurologist, who assessed chronic pain syndrome,
11   depression/anxiety, and intractable headaches, prescribed Halcion as needed (A.R.
12   815).

13

14       A week after Plaintiff filed her April 10, 2018 application for benefits, she
15   began treating with a psychiatrist who evaluated Plaintiff for depression and PTSD
16   (A.R. 2234-37). Plaintiff reportedly was wary, attentive, looked unhappy, and had
17   signs of mild depression on examination (A.R. 2236). She reportedly was using
18   medicinal marijuana for anxiety, and had been treated with antidepressants (A.R.
19   2235). The psychiatrist diagnosed major depressive disorder and PTSD,
20   prescribing Gabapentin (A.R. 2236-37).

21

22       Plaintiff went to her primary care doctor in May of 2018, complaining of left
23   hip pain for which she was referred to an orthopedic surgeon (A.R. 838-42).
24   Plaintiff returned in June to obtain immunizations so she could start college in
25   Minnesota (A.R. 829-33). Plaintiff had been living at home and attending a local
26   college and had earned an associate's degree (A.R. 713, 930). Plaintiff asked her
27   doctor for verification of disability to help her secure accommodations for
28   transportation and test taking (A.R. 829). There is no mention of hip pain during

8

1 this visit - Plaintiff only complained of a wart on her right foot (A.R. 829-33).

2

3 In August of 2018, after Plaintiff moved to Minnesota, Plaintiff went to the
4 emergency room for syncope with hypokalemia (low potassium), which assertedly
5 had caused Plaintiff to faint (A.R. 948-61). She reportedly had landed on her
6 tailbone, and she complained of pain in her lower back (A.R. 957). Imaging
7 showed no acute findings (A.R. 968-71). Plaintiff was kept overnight for
8 observation and given Norco and fluids (A.R. 957, 960-61).

9

10 Plaintiff received a psychological consultative examination from Dr. Marcus
11 Desmonde in October of 2018 (A.R. 930-33). She then was taking four college
12 classes and doing well except in her math class where she was "not getting along
13 too well with the professor" (A.R. 930). She was living in an apartment close
14 enough to campus for her to walk to her classes (A.R. 931). She had roommates
15 and was able to do her own laundry, sometimes make simple meals, eat in the
16 cafeteria, and bathe every couple of days (A.R. 931). Her parents were helping her
17 with rent, tuition, and food subsidies (A.R. 931).

18

19 Plaintiff told Dr. Desmonde she was applying for disability benefits based on
20 neck and back pain (since an April, 2014 car accident), fibromyalgia and assertedly
21 worsening symptoms (A.R. 931; see A.R. 516-21 (note from 2014 emergency room
22 visit after the car accident diagnosing cervical musculoskeletal strain, left shoulder
23 strain, and whiplash)). She also reported anxiety, depression, and occasional
24 memory issues (A.R. 931). She admitted that her current medications were helping
25 all of her symptoms (A.R. 932). On examination, Plaintiff was able to compute
26 serial sevens slowly, recalled two of three items immediately, one of three items
27 after five minutes, and one of three items by the end of her interview (A.R. 932).
28 Dr. Desmonde estimated Plaintiff's IQ to be at 100, plus or minus five points (A.R.

9

932). Dr. Desmonde noted that Plaintiff had reported that her pain was constant at 6 or 7 out of 10, and some days at 8 or 9 out of 10, and there were some days every week or two when she had a hard time getting out of bed, yet Plaintiff did not have any observable gait disturbance or pain behavior during the examination (A.R. 932). Dr. Desmonde opined that Plaintiff would have moderate-to-marked limitations in managing her activities of daily living without the assistance of her parents, and she would have mild to moderate limitations in all other areas of functioning (A.R. 933).

Later in October of 2018, Plaintiff established care with a new primary care doctor in Minnesota (A.R. 1783). Plaintiff asked for a trauma psychotherapist referral and a neurology referral for chronic headaches and pain (A.R. 1783). She reportedly was walking 20 minutes a day for exercise (A.R. 1784). Her examination revealed no motor or sensory deficits, a normal gait, and normal behavior and interactions (A.R. 1785). Her doctor gave her a Toradol shot for headaches, stopped Plaintiff's Percocet prescription, prescribed migraine medication, and made the requested referrals (A.R. 1785-86).

In November of 2018, Plaintiff's chronic pain reportedly was stable with Amitriptyline and Gabapentin (A.R. 1777). She returned later in November, complaining of flank pain from possible kidney stones (A.R. 1771-74). She had tenderness on examination and was diagnosed with left buttock gluteal tendinitis and urinary pain, and she was given a steroid injection (A.R. 1773). She had a physical therapy evaluation in December, where she reported constant pain at 5/10 at rest and 10/10 with activity (A.R. 945). Her physical therapist assessed lumbar radicular pain with left hip bursitis impairing Plaintiff's posture, muscle performance, gait, joint mobility, locomotion, motor function, and range of motion (A.R. 946). Plaintiff's goal in the therapy was to be able to walk around school

1    with pain no more than 3/10 in six to eight weeks (A.R. 946).

2

3    Later in December of 2018, Plaintiff went to the emergency room for
4    evaluation of lower back and neck pain after she reportedly slipped and fell on ice
5    (A.R. 939-44). She had no acute findings, but imaging showed some mild bilateral
6    facet arthropathy at L3-L4, L4-L5 and lumbar spondylosis (A.R. 942-43, 963-66).
7    Plaintiff was able to bear weight and ambulate (A.R. 939). She was assessed with
8    cervical and lumbar strain and prescribed Norco (A.R. 943). When Plaintiff
9    presented for an unrelated gynecological procedure in January of 2019, she
10   reportedly was walking 20 minutes a day for exercise (A.R. 1768; see also A.R.
11   1708, 1727, 1732, 1736, 1739, 1743 (subsequent visits through November of 2019
12   (the rest of Plaintiff's time in Minnesota), reporting Plaintiff was walking 20
13   minutes a day for exercise)).

14

15   In January of 2019, after Plaintiff's disability claim had been denied on
16   initial review (A.R. 244), Plaintiff asked her primary care doctor to complete
17   paperwork regarding PTSD (A.R. 1762). Plaintiff reportedly asserted that she was
18   not able to work because of her numerous medical issues, but primarily because of
19   PTSD, which assertedly is triggered by work situations (A.R. 1762). Her doctor
20   reportedly completed the paperwork (but such paperwork does not appear to be in
21   the record) (A.R. 1765). Later that month, Plaintiff complained of ongoing left hip
22   pain when getting up from a seated position and walking (A.R. 1758). On
23   examination, Plaintiff exhibited no motor or sensory deficits but tenderness
24   consistent with gluteal tendinopathy and trochanteric bursitis (A.R. 1760). Plaintiff
25   declined a tenotomy and a steroid injection and asked for a second opinion (A.R.
26   1760). Her doctor referred her to sports medicine for the second opinion (A.R.
27   1760). At her next visits in February and March of 2019, Plaintiff exhibited no
28   motor or sensory deficits and had a normal gait (A.R. 1748, 1752, 1757).

1

2   Plaintiff also began to see a therapist in January of 2019 (A.R. 1561-69). On

3   an intake form, Plaintiff reported that she then was a full-time student in her junior

4   year, working toward a bachelor's degree (A.R. 1562). However, she claimed she

5   had not been able to work since her 2014 car accident (A.R. 1562). She also

6   claimed that it was becoming increasingly difficult for her to attend school (A.R.

7   1562). She asserted that she had a history of abuse (described as "complex

8   traumas") assertedly causing PTSD for which she had been in therapy since 2016

9   (A.R. 1562-63, 1566). She was living with a male roommate, who helped her feel

10  safe, but she had moved in with him after having issues with being triggered by

11  prior roommates (A.R. 1565). She reported that she always had elevated anxiety

12  which sometimes causes panic attacks, and often had days when it was hard for her

13  to get out of bed due to various illnesses (A.R. 1564, 1566). In March of 2019,

14  Plaintiff admitted she was able to attend her classes and do homework despite these

15  issues (A.R. 1569).[4]

16

---

17  [4]     In response to a request for records, Plaintiff's social worker submitted a
18  report in March of 2019 (A.R. 974-76). The social worker reported she had seen
    Plaintiff from March 25, 2016, after Plaintiff was referred by emergency room
19  providers for suicidal ideation, until Plaintiff left for college in Minnesota in
    August of 2018 (A.R. 975). According to the social worker, Plaintiff reported
20  classic signs of PTSD and a history of abuse consistent with the symptoms the
21  social worker observed (A.R. 975). According to the social worker, Plaintiff made
    great progress with her academic performance during treatment, but was able to do
22  so because of special accommodations (A.R. 976). Plaintiff was attempting to take
23  some college classes but supposedly was unable to follow through on her
    commitments due to cognitive impairments, psychosocial issues, and debilitating
24  medical issues (A.R. 975; compare A.R. 1153-54 (Plaintiff reporting in 2015 that
25  she was in college taking 18 units of classes for six to 12 hours a day, and spending
    the rest of her time doing homework or cooking); A.R. 1160 (Plaintiff reporting in
26  October of 2016 that she was attending school, doing homework, and studying a
27  total of four to ten hours a day)).

28

12

1   In April of 2019, after Plaintiff's claim was denied on reconsideration review
2   (A.R. 264), Plaintiff told her therapist she was feeling "overwhelmed" by academic
3   demands and by being denied social security benefits (A.R. 1574). At her next
4   visit, however, she reported that she was functioning, able to complete her
5   academic tasks, and able to focus on her studies after she pared down her classes
6   (A.R. 1575-76). She discussed how significant it was that she was able to feel good
7   enough to travel across the country and go to college (A.R. 1576). She finished her
8   finals in May, and "look[ed] and report[ed] feeling better" (A.R. 1577). Later in
9   May, Plaintiff reported she was "really high" because she had anxiety that morning
10  at the thought of returning home to her family's dysfunction (A.R. 1578). At the
11  next visit, Plaintiff assertedly was stressed and crying because she was afraid that, if
12  she did not receive social security benefits, she would run out of money and have to
13  return home (A.R. 1579).

15  In June of 2019, Plaintiff complained to her doctor of left hip and buttock
16  pain from gluteal tendinopathy but said she was walking 20 minutes a day for
17  exercise (A.R. 1734-36). She exhibited tenderness on examination but a normal
18  gait (A.R. 1736; see also A.R. 1728, 1740, 1744 (May, June, and August, 2019
19  notes also reporting normal gait)). She was prescribed Celecoxib (A.R. 1736). She
20  also asked for something to help with anxiety because of an upcoming trip home
21  (A.R. 1738). She was prescribed Hydroxyzine (A.R. 1741).

22  ///

24      The social worker opined that Plaintiff's treatment progress was frequently
25  hampered by setbacks, depressive episodes, medical flare-ups, and chronic/high
26  anxiety (A.R. 976). Plaintiff also reportedly spent many sessions barely able to sit,
    move, or concentrate due to pain (A.R. 975). The social worker stated a belief that,
27  during Plaintiff's treatment with her (i.e., until August 2018), Plaintiff "would not
    have been able to meet the demands of a job, specifically being consistently at a
28  certain place for a determined amount of time" (A.R. 976).

1         In August of 2019, Plaintiff told her therapist that she had been accosted by a

2    man at her apartment's community sauna (A.R. 1585). Plaintiff then reportedly had

3    a panic attack during that therapy session (A.R. 1585). During her next therapy

4    session, Plaintiff mentioned a plan to return to working out in the mornings (A.R.

5    1585). In September of 2019, she reported she had been evicted from her

6    apartment over a dispute with her roommate, and had returned home to California

7    to recover from the stress (A.R. 1589, 1591-94). She later said she was back in her

8    apartment, but afraid of her roommate, so she planned to leave in December (A.R.

9    1595).

10

11        In November of 2019, Plaintiff was admitted to the hospital with

12   hypokalemia and a concussion after having an episode of syncope where she

13   reportedly fell and hit her head (A.R. 977-1058). Plaintiff said, "a lot of people I've

14   met have been really mean," complained of issues with her roommates, and said she

15   had "very passive" suicidal ideation (A.R. 1056). She also reported significant

16   memory issues, but, on examination, her memory appeared grossly intact (A.R.

17   1057). She exhibited abnormal gait and station at that time (A.R. 1057). Her

18   doctor expressed concern regarding Plaintiff's psychological distress and her safety

19   in ambulating alone (A.R. 1057). Testing during her hospital stay showed no

20   evidence of an acute brain injury, but her doctor noted that post-concussive

21   symptoms like headaches and nausea can persist for up to 18 weeks, and prescribed

22   medications for these symptoms (A.R. 1040, 1050). Plaintiff followed up with her

23   doctor later in November, reporting that her gait was improved and she was feeling

24   less anxious (A.R. 1706). She had decided to move back to California to be closer

25   to her family (A.R. 1706).

26

27        In January of 2020, Plaintiff saw a new primary care doctor in California,

28   complaining of right shoulder pain, stress, and memory issues (A.R. 1116). She

1    also saw her psychiatrist for PTSD and depressive symptoms (A.R. 1141). She said
2    she was not doing well (A.R. 1141). She followed up with monthly medication
3    management with her psychiatrist where her medications sometimes were adjusted.
4    At almost all of her visits, Plaintiff reported that her symptoms were improving.
5    See A.R. 2115-20, 2123-27, 2129-32, 2137-38, 2143-46, 2189-2210, 2250-51,
6    2662-81 (reporting improvement in April, May, June, July, September, October,
7    November, and December of 2020, January, April, July, August, October,
8    November, and December of 2021, January, March, April, May, June, August,
9    September, October, November, December of 2022, and January, February, April,
10    May, June, July, August, September, and October of 2023). Her psychiatrist
11    provided an evaluation form in February of 2023, referring to his progress notes
12    and stating that he could not assess Plaintiff's level of functioning (A.R. 2230-33).

14    Meanwhile, Plaintiff returned to her primary doctor in September of 2020,
15    complaining of low back pain from bursitis (A.R. 2259). Reportedly, she had
16    tenderness in her hips, knees, and back on examination, but no other findings (A.R.
17    2260). She was referred for physical therapy and for bariatric surgery, if she could
18    not lose weight through conservative measures (A.R. 2261). Plaintiff followed up
19    in November of 2020, complaining of hip pain—she said she could not go to
20    physical therapy without using CBD or numbing medication for transportation
21    (A.R. 2284087). She requested a form for disability benefits (A.R. 2284-85). She
22    had tenderness and muscle spasms on examination, but no other reported findings
23    (A.R. 2286). She was referred for pain management for bursitis (A.R. 2287).

25    In July of 2021, Plaintiff had an internal medicine consultative examination
26    with Dr. Daniela Drake (A.R. 2170-75). During the examination, Plaintiff was
27    using a walker, which she claimed she had used for many years because of
28    fibromyalgia (A.R. 2170). Yet, this was the first mention in any of the medical

1   records that Plaintiff was using a walker. Compare A.R. 201 (Plaintiff testifying at
2   the first hearing in June of 2020 that she had used a walker since October of 2019);
3   A.R. 1522 (Plaintiff reporting in June of 2021 that she had been using a walker
4   every day since 2019). On examination, Dr. Drake observed that Plaintiff
5   intermittently hyperventilated, which appeared to be malingering, exaggerated pain
6   complaints, and frequently gave poor effort (A.R. 2171-73). Plaintiff weighed 320
7   pounds, had 5/5 strength, ambulated with a walker in a moderately slow shuffling
8   gait and refused to stand or walk without the walker (A.R. 2171-73). However, Dr.
9   Drake observed Plaintiff outside after the exam ambulating "with a normal stride
10  with her walker" and in a "normal phase" (A.R. 2171). Dr. Drake opined that
11  Plaintiff would be capable of light work consistent with the ALJ's residual
12  functional capacity assessment, and opined specifically that Plaintiff would not
13  require an assistive device (A.R. 2174-75).

15      In November of 2021, Plaintiff presented to her primary care doctor for an
16  annual exam, complaining of one-to-two migraines a week, lasting two days to two
17  weeks, and memory and concentration issues since 2019 (A.R. 2315). On
18  examination, she exhibited intact motor functioning and normal gait, but difficulty
19  tandem walking (reportedly due to the severity of a headache), and she then was
20  ambulating with a walker (A.R. 2318-19). The doctor referred Plaintiff to a
21  neurologist (A.R. 2319). When Plaintiff returned in April of 2022, she reportedly
22  had a normal gait, normal tandem walk and there was no mention of a walker (A.R.
23  2346-51).

25      Plaintiff went to a pain management doctor in November of 2021,
26  complaining of whole body pain with a history of fibromyalgia (A.R. 2559). On
27  examination, Plaintiff reportedly had tenderness and reduced range of motion in her
28  cervical and lumbar spine but normal lower extremity strength (A.R. 2561-62).

16

1   There was no mention of a walker (A.R. 2561-62). The doctor diagnosed
2   fibromyalgia and neuropathy and prescribed Lyrica (A.R. 2562). Plaintiff followed
3   up in February of 2022, reporting significant relief from Lyrica (A.R. 2555). In
4   May, she reported running out of medication and managing with CBD/THC, so the
5   Lyrica was refilled (A.R. 2552-54). In August, she reported that her pain was
6   constant and ranged from 5-6/10 to 9/10, depending on activity (A.R. 2549). She
7   requested a lower Lyrica dose because she was urinating during her sleep (A.R.
8   2549). She admitted that her pain then was controlled with home exercises of
9   stretching and walking, rest and medication (A.R. 2549). On examination, Plaintiff
10  exhibited tenderness (A.R. 2550). There was no mention of a walker (id.). In
11  November, Plaintiff reported she had filled a Norco prescription the previous month
12  because she fell down a flight of stairs and went to the emergency room (A.R.
13  2545). She then reportedly was using a walker (A.R. 2547). The Lyrica was
14  refilled (A.R. 2547). When Plaintiff followed up with her primary care doctor by
15  telephone concerning her fall, Plaintiff was diagnosed with musculoskeletal pain
16  and she agreed to try physical therapy (A.R. 2406).
17
18      In November of 2022, Plaintiff had a psychological consultative examination
19  with Dr. Charlene Krieg (A.R. 2176-81). Plaintiff reportedly was using a walker,
20  had difficulty rising from a sitting position and needed help from her mother even
21  to stand (A.R. 2176). Plaintiff complained of concentration and memory problems
22  since 2019, PTSD, dissociative identity disorder, depression, anxiety and night
23  terrors (A.R. 2177-78). She reported that she stayed home or went to physical
24  therapy or doctor appointments, and could not manage self-care without assistance
25  (A.R. 2177). On examination, she had an anxious mood, constricted affect, intact
26  working memory in the low average range, intact recent and remote memory,
27  moderate deficit in attention and concentration testing, low average working
28  memory subtests, average verbal comprehension, normal insight and judgment, and

17

1  a full-scale IQ of 84 in the low average range  (A.R. 2179-80).  Dr. Krieg diagnosed
2  complex PTSD, dissociative identity disorder, major depressive disorder,
3  generalized anxiety disorder, and panic disorder - per the records and history - and
4  an unspecified personality disorder (A.R. 2180).  Dr. Krieg observed that Plaintiff's
5  mental status examination did not evidence disorder (A.R. 2180).  Dr. Krieg opined
6  that Plaintiff would be capable of performing simple/repetitive and
7  detailed/complex work tasks, and there was no mental impairment that would limit
8  her ability to engage in work activities, complete a normal workday or workweek,
9  deal with the usual stress in competitive work and adjust to change (A.R. 2181; see
10 also A.R. 2182-84 (Dr. Krieg's Medical Statement of Ability to Do Work-Related
11 Activities (Mental) form indicating no limitations)).

12

13      In December of 2022, Plaintiff had a lumbar spine MRI, which showed L4-
14 L5 disc protrusion, mild spinal canal narrowing with suspected compression of the
15 L5 nerve root, and edema which could be suggestive of a L4-L5 ligamentous sprain
16 (A.R. 2514-15).  When Plaintiff followed up by telephone for the MRI results, she
17 requested a new neurology referral for almost daily headaches because her previous
18 referral from November of 2021 had expired (A.R. 2429).  The doctor prescribed a
19 steroid taper for lumbar spine pain, and referred Plaintiff to orthopedics and
20 neurology (A.R. 2432-33).

21

22      In January of 2023, Plaintiff saw a neurologist for headaches (A.R. 2572).
23 She reported headaches every day, and migraines 2-3 times a month allegedly
24 lasting between two and five days (A.R. 2572).  She then was using a walker (A.R.
25 2572).  She was prescribed two headache medications (A.R. 2574).

26

27      In February of 2023, Plaintiff went to a physician's assistant for disability
28 forms regarding Plaintiff's "past psychiatric history including complex PTSD with

18

1 night terrors" (A.R. 2475-76). She asserted a psychiatric history, chronic medical
2 conditions, use of a walker making it hard to perform simple chores, memory
3 changes, difficulty with recalling simple tasks, and debilitating migraines multiple
4 times a week (A.R. 2475). She admitted being able to dress, bathe, and toilet on
5 her own (A.R. 2475). On examination, she exhibited lumbar spine tenderness with
6 decreased range of motion, and a mental status examination score of 27 (A.R. 2478-
7 79). She reportedly fidgeted with a walker when asked to recall from memory
8 (A.R. 2479). The physician's assistant referred Plaintiff to "neuropsych" for a
9 comprehensive evaluation (A.R. 2479). The assistant stated, consistent with what
10 Plaintiff had described, that Plaintiff's ability to carry out simple tasks was affected,
11 and she ambulated with a walker with limited range of motion secondary to pain
12 which "impedes her ability to perform expected physical tasks of a job" (A.R.
13 2479-81).

15 In February of 2023, Plaintiff also followed up with pain management,
16 complaining of buttock pain supposedly radiating to the right thigh and down to her
17 feet (A.R. 2637). She then was using a walker (A.R. 2639). The doctor continued
18 Lyrica for pain and prescribed a topical gel (A.R. 2639).

20 In February of 2023, Plaintiff had a physical therapy session, during which it
21 was noted that she was "seen in severe acute state of low back and right leg pain.
22 Has severe difficulty with mobility due to her pain and severe obesity. Unable to
23 perform exercises due to her size and mobility issues, not a good PT candidate.
24 Will proceed with education and modalities" (A.R. 2650). Plaintiff's reported goal
25 was to increase her mobility to restore functioning for home and work-related
26 activities, her sitting and standing tolerances to 30 minutes in four weeks, and
27 "job/ADL demands" in six weeks (A.R. 2651). Plaintiff had a second session the
28 next week, which she reportedly tolerated a bit better, but the assessment was the

1  same as at the first visit (A.R. 2652). Plaintiff had a third session at the end of

2  February, where she reportedly was doing "a bit better" (A.R. 2654).

4    Plaintiff's physical therapist completed a Physical Medical Source Statement

5  in February of 2023, after Plaintiff had attended the three sessions (A.R. 2566-68).

6  Plaintiff had positive straight leg raising on the right side (A.R. 2566). The

7  physical therapist opined that Plaintiff could walk zero blocks without rest or severe

8  pain, sit for 10 minutes, stand/walk for zero minutes, sit for less than two hours a

9  day, stand/walk for less than two hours a day, would need to walk every 10 minutes

10  for five minutes, would need to shift positions at will, would require unscheduled

11  breaks, would need an assistive device, could lift less than 10 pounds, could never

12  twist, stoop, crouch, climb ladders or stairs, and would miss more than four work

13  days a month (A.R. 2566-68). The therapist opined that "pain and mobility will

14  affect any type of job requirements" (A.R. 2568).

16    In March of 2023, Plaintiff had another physical therapy session, where she

17  reportedly was doing better and had improved mobility on and off the exam table

18  (A.R. 2656). At the next session, Plaintiff again reportedly had better mobility and

19  was advised to progress with "HEP" (a home exercise program) with no further

20  authorizations (A.R. 2658).

22    When Plaintiff followed up with pain management in May of 2023, she

23  reported that she had not taken Lyrica for a while because her pharmacy closed

24  (A.R. 2633). She complained that her right leg felt like it is on fire sometimes, and

25  she felt like there are times when she could not move it at all (A.R. 2633). The

26  doctor noted that these complaints were consistent with L4-L5 pathology (A.R.

27  2633). An orthopedist reportedly had recommended an epidural steroid injection,

28  although there are no records from this orthopedist (A.R. 2633). Plaintiff deferred

1 surgery (A.R. 2633). Plaintiff did have lumbar epidural steroid injections in June
2 and September of 2023 (A.R. 2619-30).

3

4         **B.**     **Summary of Plaintiff's Testimony and Statements**

5

6       Plaintiff testified to symptoms of allegedly disabling severity. At the first
7 hearing in 2020: she said she could stand for only 10 minutes, sit for only five
8 minutes, walk for only two minutes, and lift only five pounds; she claimed she had
9 been using a walker since October of 2019; she said she spent most of the day lying
10 down, needed help dressing and showering, and only left her house once a month
11 (because PTSD supposedly makes it hard for her to be outside of her home). See
12 A.R. 197-206 (Plaintiff's testimony at the first hearing); see also A.R. 388-96
13 (Function Report form from April of 2018 - two months before Plaintiff sought
14 immunizations to go away for college - claiming she: spent most of her time in
15 bed; did very little activity beyond going to campus for one class six hours per
16 week; took an online class, doing her homework in bed and watching television;
17 needed help with bathing and personal care to the point that she wore pads to "use"
18 when she could not get up to use the toilet because of pain; could walk "maybe" 20
19 steps before needing to rest; and could pay attention from zero to 20 minutes).

20

21       Following this Court's remand, Plaintiff testified at the second hearing in
22 December of 2023, claiming even more limitations. She then said she: has had
23 memory issues since 2019 and problems with staying focused and concentrating,
24 which prevent her from going to school and make it hard to keep a conversation
25 going; can walk if she has an epidural treatment but without one she stays in bed all
26 day; needs help even to get out of bed; falls and has migraines (which limit her
27 screen time); and gained 60 pounds since the last hearing (which impacted her
28 ability to do things even more than that to which she testified at the previous

1    hearing).  See A.R. 1214-22 (Plaintiff's testimony at the second hearing); see also

2    A.R. 1493, 1517-23 (June, 2021 Function Report form claiming that Plaintiff could

3    not sit without pain, is immobilized and confined to her bed, has difficulty walking

4    due to calcification of her left hip, uses a commode because she cannot always

5    make it to the bathroom, and has used a walker every day since 2019); A.R. 1497-

6    1504 (June, 2021 Function Report form from Plaintiff's mother claiming similar

7    limitations)).

## C.   **Applicable Law**

11         An ALJ's assessment of a claimant's credibility is entitled to "great weight."

12    Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Nyman v. Heckler, 779

13    F.2d 528, 531 (9th Cir. 1985). Where, as here, an ALJ finds that a claimant's

14    medically determinable impairments reasonably could be expected to cause some

15    degree of the pain and other symptoms of which the claimant subjectively

16    complains (A.R. 1185), any discounting of the claimant's complaints must be

17    supported by "specific, cogent" findings. See Berry v. Astrue, 622 F.3d 1228, 1234

18    (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen

19    v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must offer

20    "specific, clear and convincing" reasons to reject a claimant's testimony where

21    there is no evidence of "malingering").[5]

---

23    [5]    In the absence of an ALJ's reliance on evidence of "malingering," most
24    recent Ninth Circuit cases have applied the "clear and convincing" standard. See,
     e.g., Nerio Mejia v. O'Malley, 120 F.4th 1360, 1363 (9th Cir. 2024); Ferguson v.
25    O'Malley, 95 F.4th 1194, 1197-98 (9th Cir. 2024); Glanden v. Kijakazi, 86 F.4th
     838, 846 (9th Cir. 2023); Smartt v. Kijakazi, 53 F.4th 489, 497 (9th Cir. 2022);
26    Leon v. Berryhill, 880 F.3d 1041, 1046 (9th Cir. 2017); see also Ballard v. Apfel,
27    2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases). In
28    Ahearn v. Saul, 988 F.3d 1111, 1116 (9th Cir. 2021), the Ninth Circuit appeared to

1          Generalized, conclusory findings do not suffice. An ALJ's credibility

2  findings "must be sufficiently specific to allow a reviewing court to conclude the

3  ALJ rejected the claimant's testimony on permissible grounds and did not

4  arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882,

5  885 (9th Cir. 2004) (internal citations and quotations omitted); see Holohan v.

6  Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ must "specifically

7  identify the testimony [the ALJ] finds not to be credible and must explain what

8  evidence undermines the testimony"); Smolen v. Chater, 80 F.3d at 1284 ("The

9  ALJ must state specifically which symptom testimony is not credible and what facts

10  in the record lead to that conclusion."); see also SSR 96-7p (explaining how to

11  assess a claimant's credibility), superseded, SSR 16-3p (eff. Mar. 28, 2016).[6]

12  ///

13  ///

14  ///

15

---

16  apply both the "specific, cogent" standard and the "clear and convincing" standard.

17  As detailed below, the ALJ arguably needed to state only "specific, cogent" reasons
to discount Plaintiff's allegations since the ALJ relied in part on Dr. Drake's

18  opinion that Plaintiff was malingering. See A.R. 1188-89, 1192 (ALJ's reasoning);
see also Carmickle, 533 F.3d 1155, 1160 & n.1 ("The only time this [clear and

19  convincing] standard does not apply is when there is affirmative evidence that the

20  claimant is malingering."); Morgan v. Comm'r, 169 F.3d 595, 599 (9th Cir. 1999)
("specific, cogent" standard applies where affirmative evidence shows malingering)

21  (dicta). In any event, the ALJ's findings in this case are sufficient under either

22  standard, so the distinction between the two standards (if any) is academic.

23  [6]    Social Security Rulings are binding on the Administration. See Terry v.

24  Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990). The appropriate analysis under
the superseding SSR is substantially the same as the analysis under the superseded

25  SSR. See R.P. v. Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016)

26  (stating that SSR 16-3p "implemented a change in diction rather than substance")
(citations omitted); see also Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir.

27  2017) (suggesting that SSR 16-3p "makes clear what our precedent already

28  required").

1

2

### D.    The ALJ' s Decision

3    In determining Plaintiff's RFC, the ALJ summarized  testimony and

4    statements by Plaintiff claiming she is incapable of working (A.R. 1184-85).  The

5    ALJ also discussed the medical record at length—including the evidence from Dr.

6    Drake suggesting that Plaintiff was malingering during her internal medicine

7    examination.  See A.R. 1179-97 (detailing the record in deciding steps two, three,

8    and four of the sequential evaluation process).  The ALJ ultimately discounted

9    Plaintiff's testimony and statements regarding the severity and frequency of

10    symptoms based on inconsistencies with the objective evidence and with Plaintiff's

11    treatment history.  See A.R. 1186-92 (mentioning same in discussing the record).

12

13    Regarding Plaintiff's alleged physical impairments, the ALJ reasoned:

14

15    There are several factors or inconsistencies that do not support the

16    severity and frequency of alleged symptoms noted by the claimant or

17    her mother, such as lifting only 5 pounds, the need for a walker,

18    standing and walking for only a few minutes, and not being able to get

19    out of bed most days.  In 2018, the psychological consultative

20    examiner noted the claimant alleged 6 or 7 out of 10 pain most days,

21    but no gait disturbance or pain behavior was observed [citing A.R.

22    932].  Additionally, at the end of 2018 and into 2019, [Plaintiff] was

23    walking 20 minutes a day for exercise [citing A.R. 1727, 1784; see

24    also A.R. 1708, 1732, 1736, 1739, 1743, 1768, 1781 (noting same)].

25    She was noted to feel good enough physically and psychologically to

26    go across the country to college in 2018 and 2019 [citing A.R. 1576].

27    Furthermore, despite alleged fibromyalgia pain, many exams show no

28    motor deficit and/or a normal gait [citing A.R. 1709, 1720, 1728,

24

1736, 1740, 1748, 1752, 1785; see also A.R. 1744, 1757, 1760, 1764,
(noting same)]. Treatment of hip pain was conservative with
medication and physical therapy [citing A.R. 1736 (prescribing
Celecoxib), 1773 (giving left buttock steroid injection and referring for
physical therapy), 2274-75 (referring for physical therapy)] and the
claimant declined the tenotomy [citing A.R. 1760]. Even with
conservative treatment, symptoms were episodic with some exams
showing no tenderness of the hips or buttocks [citing A.R. 1808 (2016
treatment note after Plaintiff dropped something on her toe)]. Lyrica
also helped her pain [citing A.R. 2549; see also A.R. 1186 (ALJ noting
Plaintiff's pain also reportedly was controlled with home exercises and
stretching, citing A.R. 2549, and that Plaintiff's pain had been
managed with medical marijuana, citing A.R. 820)]. Imaging in late
2022 did show a disc protrusion and spinal canal narrowing but only
possible compression of the L5 nerve root [citing A.R. 2514-15] but
with exams not showing significant neurological deficits [citing A.R.
2562]. Although she used a walker, the evidence does not show it was
medically necessary with the consultative examiner noting the
claimant put forth full [sic][7] effort with malingering likely [citing A.R.
2171-72]. Even with malingering, she had full strength [citing A.R.
2173]. Exams by her own medical sources also show no weakness
[citing A.R. 2331; see also A.R. 2319 (noting same)]. The claimant
was also able to progress with physical therapy in early 2023 [citing
A.R. 2648, 2658] with further improvement in symptoms once she

---

[7]   Dr. Drake actually noted Plaintiff put forth "poor" effort during the
examination, as the ALJ acknowledged when the ALJ summarized that evidence.
See A.R. 1188 (citing A.R. 2171-72). The ALJ's notation here that Plaintiff had
put forth "full" effort thus appears have been an error.

1    started getting epidural injections in June 2023 [citing A.R. 1215,

2    2620, 2622, 2627]. Treatment records also do not document side

3    effects to her chronic medication. Although the claimant testified she

4    mostly stayed in bed and needed help with her personal care, could

5    perform limited re-heating of food, and could perform no household

6    chores, the evidence indicating intact motor functioning is not

7    consistent with that degree of limitation [see A.R. 1186-87 (discussing

8    examinations showing no motor deficits at A.R. 1748, 1752, 1760,

9    1785, 2331, 2357)].

11   (A.R. 1181).

13   Regarding Plaintiff's allegation that she had to use a walker since October of

14   2019, the ALJ elsewhere acknowledged that there were some examinations where

15   Plaintiff presented with a walker. See A.R. 1180 (citing A.R. 2170-71, 2490,

16   2547); see also A.R. 1187 (discussing additional examinations where Plaintiff

17   notedly was using a walker at A.R. 2573-74, 2639)). The ALJ pointed out that the

18   examination in November of 2021 reported Plaintiff was using a walker due to the

19   severity of a headache Plaintiff then was having—Plaintiff's motor function was

20   otherwise intact with no weakness and an otherwise normal gait (A.R. 1186-87

21   (citing A.R. 2331)). The ALJ found no evidence of a "medically determinable"

22   need for a walker (A.R. 1180). The ALJ noted that, although Plaintiff refused to

23   attempt to walk without her walker during her consultive examination with Dr.

24   Drake in 2021 and displayed a slow shuffling gait while she was in the office, Dr.

25   Drake observed Plaintiff to have a normal stride and phase when ambulating

26   outside the office, and Plaintiff had put forth poor effort (AR 1180 (citing A.R.

27   2171)). Plaintiff also had intact strength even when she started presenting with a

28   walker (A.R. 1181 (citing A.R. 2331, 2625)).

26

1    The ALJ reportedly accounted for limitations from Plaintiff's obesity and
2    pain by restricting Plaintiff to light work with occasional postural activities (A.R.
3    1189). The ALJ further limited Plaintiff to no climbing of ladders, ropes, or
4    scaffolds, working at unprotected heights, or with concentrated exposure to
5    excessive noise or vibration, and no work around open bodies of water or
6    dangerous machinery to account for Plaintiff's pain, use of medication including
7    CBD/THC, and migraines (A.R. 1189). The ALJ also added limitations for
8    exposure to temperature extremes or pulmonary irritants to account for breathing
9    problems and asthma (A.R. 1189).

11    Regarding Plaintiff's alleged mental impairments, the ALJ reasoned:

13    . . . [T]he evidence is consistent with mental health impairments with
14    symptoms increasing with situational stressors. Additionally, the
15    claimant reported not getting along with others and not liking to go
16    out. However, as discussed above, the claimant remained socially
17    appropriate even when appearing anxious or depressed [see A.R. 1190
18    (citing A.R. 1565-66, 1569, 1571, 1577, 1579-81, 1584-85, 1587
19    (therapy notes describing Plaintiff as "typically very pleasant and
20    engaged"))] and she also had an improvement in symptoms with
21    treatment [see A.R. 1189-90 (citing A.R. 976 (noting Plaintiff made
22    good progress in therapy by the time she was discharged to leave for
23    college in Minnesota), 1577 (noting Plaintiff was feeling better))].
24    Testing confirmed the claimant's memory remained intact despite
25    alleging deficits after falls or acute head injuries. [see A.R. 1191
26    (citing A.R. 2179, 2331, 2553, 2557, 2562, 2625 (noting normal/intact
27    memory)]. Additionally, although she spoke slowly or performed
28    slowly on the Trails tests, her thinking and speech were logical and

27

1       coherent. [See A.R. 1191 (citing A.R. 1144, 1146, 2137, 2139, 2141,

2       2149, 2151, 2153, 2157, 2159, 2161, 2189, 2197, 2199, 2201, 2203,

3       2211, 2213, 2223, 2662, 2666)].  This is consistent with a finding that

4       . . . the claimant is limited to noncomplex tasks in a routine

5       environment; no jobs requiring public interaction; occasional

6       interaction with coworkers and supervisors; and no fast-paced work

7       such as rapid assembly or conveyor belt work.

8

9 (A.R. 1191-92).

10

11       In the ALJ's Listings analysis, the ALJ explained in more detail why Plaintiff

12 was not as limited in mental functioning as she claimed in some of her reports.

13 Although Plaintiff alleged memory issues interfering with her ability to understand

14 instructions without re-reading them several times (A.R. 1521): (1) a state agency

15 representative had observed that Plaintiff was able to answer all questions very well

16 during a phone interview (A.R. 1490); (2) Plaintiff's memory was intact even when

17 she alleged significant issues (A.R. 983, 2553, 2557, 2562, 2625); (3) testing in

18 2022 showed her memory was intact with an immediate working memory in the

19 low average range (A.R. 2179); (4) her full scale IQ score was 84 in the low

20 average range (A.R. 2179-80); and (5) in 2023 her mental status examination scores

21 were intact at 27 and 29 (A.R. 2331, 2489).  See A.R. 1181-82 (ALJ's discussion).

22

23       Although Plaintiff alleged she had difficulty getting along with others and

24 did not feel safe going anywhere by herself or leaving the house because she did not

25 want to get COVID-19 (A.R. 1519-22), and the treatment record showed she left

26 college due to housing and roommate problems (A.R. 1592-93):  (1) many

27 examinations showed Plaintiff had an appropriate mood and affect (A.R. 931, 939,

28 1579, 1581, 1585, 1732, 1738, 1740, 1773, 2145, 2151, 2159); (2) she was engaged

1  during therapy (A.R. 1565-66, 1569, 1571, 1577, 1580, 1584, 1587); and (3) she

2  made eye contact and had fair interaction during her 2022 consultative examination,

3  despite appearing anxious (A.R. 2176). See A.R. 1182; see also A.R. 1190-91

4  (discussing this evidence).

5

6      Although Plaintiff had alleged that she could pay attention for only a few

7  minutes, lost focus quickly, and did not always finish what she started (A.R. 1521):

8  (1) during a 2019 evaluation, she was able to repeat phrases and name objects

9  appropriately (A.R. 983); (2) during a 2022 consultative examination, she did not

10  appear distracted and had moderate deficit on Trails A and B tasks (2179);

11  (3)  Plaintiff appeared attentive during appointments (A.R. 1142, 1144, 1146, 2135,

12  2145, 2151, 2159); (4) Plaintiff's thinking was logical (A.R. 2141, 2149, 2151,

13  2153, 2157, 2159, 2161, 2163, 2189, 2199, 2203, 2205, 2211, 2213, 2250, 2662,

14  2666); (5) Plaintiff's speech was coherent, with few exams showing slowed but

15  coherent speech (A.R. 2137, 2139, 2141, 2143, 2149, 2151, 2153, 2157, 2159,

16  2161, 2163, 2197, 2201, 2213, 2223, 2250, 2662, 2666). See A.R. 1182.

17

18      **E.    Analysis**

19

20      The ALJ's lengthy discussion contains sufficient specificity for the Court to

21  conclude that the ALJ discounted Plaintiff's subjective testimony and statements on

22  permissible grounds. See Moisa v. Barnhart, 367 F.3d at 885. The ALJ's

23  discussion of the record rationally compared and contrasted the particulars of the

24  record with the specifics of Plaintiff's asserted limitations.

25

26      The ALJ permissibly could rely on inconsistencies with the medical record to

27  discount Plaintiff's subjective allegations. See Smartt v. Kijakazi, 53 F.4th 489,

28  498 (9th Cir. 2022) ("When objective medical evidence in the record is inconsistent

29

1    with the claimant's subjective testimony, the ALJ may indeed weigh it as

2    undercutting such testimony."); Carmickle v. Comm'r, 533 F.3d 1155, 1161 (9th

3    Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting

4    the claimant's subjective testimony"); see also SSR 16-3p ("[O]bjective medical

5    evidence is a useful indicator to help make reasonable conclusions about the

6    intensity and persistence of symptoms, including the effects those symptoms may

7    have on the ability to perform work-related activities. . ."); see also Verduzco v.

8    Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (ALJ properly may discount a

9    claimant's subjective assertions that are inconsistent with the observations of third

10   parties); Copeland v. Bowen, 861 F.2d 536, 541 (9th Cir. 1988) (same).

11

12           Plaintiff cites to Burch, 400 F.3d at 680, to suggest that the ALJ could not

13   rely solely on a lack of objective evidence to reject Plaintiff's subjective

14   complaints. See Plaintiff's Brief at 9-10. After this Court's prior remand in Sarah

15   M. Q. v. Kijakazi - which had relied in part on Burch, see A.R. 1300-01 - the Ninth

16   Circuit explained that the error identified in Burch (i.e., rejecting "a claimant's

17   subjective complaints based solely on a lack of medical evidence to fully

18   corroborate the alleged severity of pain"), is not committed when an ALJ

19   "highlight[s] several inconsistencies between [a claimant's] subjective symptom

20   testimony and the objective medical evidence in the record." Smartt, 53 F.4th at

21   498 (emphasis original; distinguishing Burch as forbidding an ALJ from

22   "demanding positive objective medical evidence" to fully corroborate a claimant's

23   allegations). The ALJ in Smartt had cited as inconsistencies: (1) Smartt testifying

24   in 2018 and 2019 that she had not driven since a neck surgery 2015, yet admitting

25   in a 2016 questionnaire that she drove daily; and (2) Smartt reporting that she had

26   been unable to walk without a walker and telling an examining physician in 2018

27   that she had been using a walker since 2016, where there were "multiple specific

28   examples" from medical records in 2016, 2017, and 2018, that Smartt ambulated

1    without the use of an assistive device (or with no mention of one), and where

2    Smartt "typically appeared with a walker at Pain Center appointments and visits

3    associated with her disability application." Smartt, 53 F.4th at 497-98.

4

5        In the present case (as in Smartt), the post-remand decision demonstrated that

6    the medical evidence presented several inconsistencies with Plaintiff's allegations.

7    For example, Plaintiff alleged she used a walker every day since October of 2019,

8    and yet she had normal gait examinations after October of 2019 with no mention of

9    a walker.  Indeed, the first mention of a walker in the medical record was at

10    Plaintiff's consultative internal medicine examination in 2021.  Plaintiff refused to

11    stand or walk without her walker during a consultative examination and walked

12    with a slow shuffling gait, yet was observed after the examination ambulating with

13    a normal stride.  Plaintiff alleged she could walk no more than 20 steps before she

14    left for Minnesota.  Yet, records throughout Plaintiff's time in Minnesota reflected

15    that she was walking 20 minutes daily for exercise and was in school full-time.

16    Sufficient evidence supports the ALJ's discounting of Plaintiff's subjective

17    complaints.  Compare Kennedy v. O'Malley, 2024 WL 242992, at *2 (9th Cir. Jan.

18    23, 2024) (finding same where there was affirmative evidence of malingering from

19    treatment providers and the claimant's subjective pain complaints were not

20    supported by the medical records).

21

22        Because the ALJ's credibility findings were sufficiently specific to allow this

23    Court to conclude that the ALJ discounted Plaintiff's testimony and statements on

24    permissible grounds, Moisa v. Barnhart, 367 F.3d at 885, the Court defers to the

25    ALJ's credibility findings.  See Lasich v. Astrue, 252 Fed. App'x 823, 825 (9th Cir.

26    2007) (court will defer to ALJ's credibility determination when the proper process

27    is used and proper reasons for the decision are provided); accord Flaten v. Sec'y of

28    Health & Human Srvs., 44 F.3d 1453, 1464 (9th Cir. 1995).  Deference to the

1    ALJ's credibility findings requires affirmance of the administrative decision in the
2    present case.[8]

3

4                                    **ORDER**

5

6          For all of the foregoing reasons, IT IS ORDERED that the decision of the

7    Commissioner of Social Security is AFFIRMED.

8

9          DATED: November 24, 2025

10

11   _____

                              CHARLES F. EICK
12                   UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
       [8]      The Court should not and does not determine the credibility of Plaintiff's
27   testimony and statements concerning her subjective symptomatology. Absent legal
     error, it is for the Administration, and not this Court, to do so. See Magallanes v.
28   Bowen, 881 F.2d 747, 750, 755-56 (9th Cir. 1989).

                                        32